IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIE B. SMITH, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 2:20-CV-1026-RAH |
| JEFFERSON DUNN, Commissioner, | ) | [WO] |
| Alabama Department of Corrections, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

On December 14, 2020, Willie B. Smith, III ("Smith"), a death-row inmate housed at Holman Correctional Facility,[1] filed a complaint, pursuant to 42 U.S.C. § 1983, alleging that the Alabama Department of Corrections ("ADOC") will violate Smith's right to exercise his religious beliefs by prohibiting the presence of his personal spiritual advisor, a Christian minister, inside the execution chamber during his execution, presently scheduled for February 11, 2021.  Smith claims that the ADOC's blanket policy of prohibiting the presence of all persons who are not members of the prison's execution team, including spiritual advisors, from inside

---

[1] Holman is the ADOC's primary correctional facility for housing death row inmates and is the only facility in the state of Alabama that carries out executions.

the execution chamber abridges his federal statutory rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.,* his state constitutional rights under the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. Art I, § 3.01, and his constitutional rights under the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution.[2]

Smith seeks declaratory and injunctive relief against Defendant Jefferson Dunn, in his official capacity as the ADOC's Commissioner.

On December 14, 2020, Smith filed an Emergency Motion for Preliminary Injunction (Doc. 4), requesting that the ADOC be ordered to allow his personal spiritual advisor, Pastor Robert Wiley, Jr., to not only be physically present inside the execution chamber during Smith's execution, but to pray with Smith, hold his hand, and otherwise touch Smith at the moment of his death. According to Smith, this practice "would provide Mr. Smith comfort, strengthen his resolve, and help him properly express to God his repentance for any wrongs he has committed." (Doc. 1, p. 12.)

---

[2] Initially, Smith also raised claims concerning an ADOC policy that prohibited him from attending outdoor religious services every other Sunday with the general population inmates once Smith's execution date was set. That concern is now moot, due to the ADOC's agreement to allow Smith to listen to the Sunday services in the weeks preceding his scheduled execution. (*See* Doc. 12-1.) The policy stems from security concerns that arise when a condemned inmate is allowed to interact with the general population in the weeks preceding his scheduled execution.

The ADOC filed a response in opposition to Smith's Emergency Motion for Preliminary Injunction. Within that response, the ADOC also moved to dismiss Smith's complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief may be granted. (Doc. 12.) Smith has replied to the ADOC's response to his motion and has responded to the ADOC's motion to dismiss. (Doc. 13-1.) Following these filings, the court heard oral argument and allowed the parties to file supplementary evidentiary submissions on the preliminary injunction issue. Accordingly, this matter is ripe for review. For the reasons that follow, the ADOC's motion to dismiss is due to be GRANTED in part and DENIED in part, and Smith's motion for a preliminary injunction is due to be DENIED.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. Smith's Capital Litigation History

Following a jury trial, Smith was convicted of the 1991 execution-style murder of Sharma Ruth Johnson during a robbery and kidnapping. *See Smith v. State*, 838 So. 2d 413 (Ala. Crim. App. 2002). By a vote of 10-2, a jury recommended the death sentence.[3] The trial court accepted the jury's recommendation and sentenced Smith to death on July 17, 1992.

In 2002, the Alabama Court of Criminal Appeals affirmed Smith's conviction

---

[3] The trial court's sentencing order can be found at C. 148–67 in the trial transcript, available in Volume 1 of the habeas record filed in *Smith v. Thomas*, 2:13-cv-00557-RDP (N.D. Ala.).

and death sentence. *Id.* at 477. The Alabama Supreme Court denied certiorari, *see Ex parte Smith,* No. 1011228 (Ala. June 28, 2002), as did the United States Supreme Court, *see Smith v. Alabama,* 537 U.S. 1090 (2002) (mem.).

Smith then proceeded with both state post-conviction and federal habeas proceedings. On July 2, 2020, the United States Supreme Court denied certiorari as to Smith's habeas claims, thereby concluding Smith's appeals. *See Smith v. Dunn,* No. 19-7745, 2020 WL 3578738 (July 2, 2020) (mem.).

On November 25, 2020, Smith filed his first § 1983 complaint in the Middle District of Alabama alleging both method-of-execution and Americans with Disabilities Act claims.[4] After oral argument, that case was dismissed without prejudice.[5] On the same day that Smith's initial § 1983 suit was dismissed, Smith filed the present action.

## B. The ADOC's Change to its Execution Protocol

Historically, Holman's Christian chaplain—an ADOC employee—was a member of the prison's execution team. (Doc. 27-6, p. 7.) Prior to April 2019, the ADOC's execution protocol required the chaplain's presence inside the execution

---

[4] On December 1, 2020, while Smith's initial § 1983 case was ongoing, the Alabama Supreme Court issued a death warrant, scheduling Smith's execution on February 11, 2021.

[5] *Smith v. Dunn*, Case No. 2:19-cv-927 (M.D. Ala. Dec. 14, 2020), Doc. 25. As of the date of this order, Smith has amended his complaint in this initial § 1983 case and the ADOC has filed a motion to dismiss, which remains pending.

chamber during an execution. (*Id.*)  In response to litigation in both Alabama and Texas,[6] the ADOC amended its execution protocol in April 2019 to remove its Christian chaplain from the execution chamber.  (Doc. 12, p. 12.)  Therefore, under the amended protocol, a condemned inmate cannot have anyone in the execution chamber with him: not a spiritual advisor of his choosing, not the prison chaplain, not his legal counsel, nor any friend or family member such as a mother, father, spouse, or child.

But under the ADOC's current protocol, a condemned inmate may have contact visits from a free-world spiritual advisor in the days and moments preceding his execution.[7] On the day of his execution, the inmate's spiritual advisor may remain with the inmate in his cell until the inmate is escorted to the execution chamber.  His spiritual advisor may then witness the execution from the viewing room but is not permitted to enter inside the execution chamber. At the moment of execution, the spiritual advisor, along with other witnesses in the viewing room, can be situated less than 10 feet away from the inmate, but will be separated by two-way security glass.  The ADOC's policy applies to all religious personnel, regardless of affiliation or employer, including the prison chaplain.[8]

---

[6] *See* Doc. 12, p. 12; *see also* Doc. 27-9, pp. 25-27.

[7] ADOC EXECUTION PROCEDURES 6, 7. (Doc. 27-2, pp. 6-7.)

[8] *Id.*, p. 8 (subsection IX.G.2).

## C. The *Gutierrez* Litigation

In 2019, death-sentenced inmate Ruben Gutierrez filed a similar lawsuit after the Texas Department of Criminal Justice ("TDCJ") amended its execution protocols to remove its institutional chaplains from the execution chamber. Gutierrez alleged, *inter alia*, that the change in protocol violated RLUIPA and the First Amendment.[9] Gutierrez requested an accommodation allowing his chosen spiritual advisor to be permitted inside the execution chamber. In the alternative, Gutierrez asked that the TDCJ revert to its long-standing policy of allowing the institutional chaplain's presence inside the chamber during his execution. The district court found that Gutierrez had shown a likelihood of success on the merits of either his execution-chamber claims or the DNA-testing claims raised in the same litigation.[10] The district court denied the TDCJ's motion to dismiss and granted Gutierrez's motion to stay his execution.

On appeal, the Fifth Circuit disagreed with the trial court, holding in part that Gutierrez failed to make a strong showing of success on the RLUIPA claim, noting that the TDCJ's policy did not substantially burden Gutierrez's ability to exercise his religion. *Gutierrez v. Saenz,* 818 F. App'x 309, 314-15 (5th Cir. 2020).  Gutierrez

---

[9] *Gutierrez v. Saenz*, Case No. 19-cv-185 (S.D. Tex. 2019).

[10] *Id.*, Doc. 48; Doc. 57, p. 3.

then filed a petition for a writ of certiorari in the United States Supreme Court.

In June 2020, the Supreme Court granted a stay of execution and ordered the district court to develop a narrow factual issue: "whether serious security problems would result if a prisoner facing execution is permitted to choose the spiritual advisor the prisoner wishes to have in his immediate physical presence during the execution." *Gutierrez v. Saenz,* 141 S. Ct. 127, 128 (2020) (mem).

In compliance with this order, the district court considered the evidence and briefs submitted by the parties and concluded that "no serious security problems would result" if death-sentenced inmates were permitted to have the spiritual advisors of their choosing to be present with them inside the execution chamber.[11]

Upon review of the trial court's findings, the Supreme Court granted certiorari, vacated the Fifth Circuit's order, and remanded the case to the Fifth Circuit with instructions to remand to the district court for "further and prompt consideration" of Gutierrez's claims regarding the presence of a spiritual advisor inside the execution chamber. *Gutierrez v. Saenz,* No. 19-8695, 2021 WL 231538 (Jan. 25, 2021) (mem).

### III.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and the Court

---

[11] *Gutierrez v. Saenz*, Case No. 19-cv-185 (S.D. Tex. 2019), Doc. 124, p. 2.

concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.  STANDARD OF REVIEW

### A.  ADOC's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In ruling on a motion to dismiss for failure to state a claim on which relief can be granted, the court must accept well-pleaded facts as true, but the court is not required to accept a plaintiff's legal conclusions. *Iqbal*, 556 U.S. at 678.  A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face. *See id.* at 679 (explaining "only a complaint that states a plausible claim for relief survives a motion to dismiss").  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*  The plausibility standard requires "more than a sheer possibility that a defendant has acted

8

unlawfully." *Id.* at 678.

Factual allegations in a complaint need not be detailed but "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Id.* This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* It is the plaintiff's responsibility to allege sufficient facts to support his claims. *See Twombly*, 550 U.S. at 555.

## B. Smith's Emergency Motion for Preliminary Injunction

A party seeking emergency injunctive relief must establish four elements: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc.*

*v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002)).

A preliminary injunction requires showing "imminent irreparable harm" and "a delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *See Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1248 (11th Cir. 2016).

Courts apply a "sliding scale" by "considering the probability of plaintiffs' winning on the merits and plaintiffs' irreparable injury in the absence of interlocutory relief." *Siff v. State Democratic Executive Comm.*, 500 F.2d 1307, 1309 (5th Cir. 1974); *see also State of Texas v. Seatrain Intern., S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus.").[12]

In ruling on a preliminary injunction, the court may consider evidence, even hearsay evidence, submitted by the parties. *See Levi Strauss & Co. v. Sunrise Intern. Trading, Inc*., 51 F.3d 982, 985 (11th Cir. 1995).

## IV.  DISCUSSION

The ADOC contends that Smith's RLUIPA and ARFA claims and his

---

[12]  The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981, and all former Fifth Circuit Unit B and non-unit decisions rendered after October 1, 1981.  *See Stein v. Reynolds Secur., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

constitutional claims asserting violations of the First Amendment's Establishment and Free Exercises Clauses should be dismissed because Smith fails to state a claim for which relief can be granted. On the premise that Smith's claims are subject to dismissal under Fed. R. Civ. P. 12(b)(6), the ADOC submits that Smith is not entitled to the preliminary injunctive relief he seeks. The court addresses each claim in turn.

## A.  RLUIPA Claim

Smith claims that the ADOC will violate RLUIPA by denying his request for his spiritual advisor, a Christian minister, to be present inside the execution chamber during his execution. Smith believes that his pastor's presence during his execution is "essential for his spiritual well-being" and will provide Smith comfort to "ease the transition between the worlds of the living and the dead." (Doc. 1, pp. 2, 11.)[13] Smith alleges that the ADOC's refusal to allow his pastor's presence in the execution chamber will substantially burden his religious exercise. (*Id*., p. 13.)

RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling

---

[13] Citations to page numbers in documents filed in this case will be to the page number generated by the court's CM/ECF system.

governmental interest.

42 U.S.C. § 2000cc-1(a).

To establish a *prima facie* case under RUILPA, Smith bears the initial burden of showing "(1) that he engaged in a religious exercise, and (2) that the religious exercise was substantially burdened by a government practice." *Muhammad v. Sapp*, 388 F. App'x 892, 895 (11th Cir. 2010).  If Smith establishes a *prima facie* case, the burden shifts to the ADOC to show that the challenged government practice is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." *Id*.  Conversely, if Smith fails to present evidence to establish a *prima facie* case, the court need not inquire into whether the governmental interest at stake is compelling. *See Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007) (abrogated on other grounds); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

Context matters in the application of the compelling governmental interest standard.  *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).  The standard is applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Id.*

### 1.  Defendant ADOC's Motion to Dismiss

The ADOC argues that Smith has failed to state a RLUIPA claim upon which

relief may be granted because he has failed to plead facts showing that the ADOC will "substantially burden" the exercise of his religion. (Doc. 12, pp. 19-23.) Smith counters that he has adequately stated a facially plausible claim for relief by pleading facts that allege a substantial burden on his religious exercise. (Doc. 13-1, p. 26.)

As noted above, RLUIPA uses a burden-shifting framework.  Smith bears the initial burden of establishing a *prima facie* violation of RLUIPA. To do so, Smith must allege that he will engage in a religious exercise and that his religious exercise will be substantially burdened by a government practice.

In his Complaint, Smith avers that he is a practicing Christian and that it is "integral to [his] faith that Pastor Wiley be physically present with him at the time of his execution." (Doc. 1, p. 11.) Smith further contends that the ADOC's refusal to allow Pastor Wiley's presence in the execution chamber substantially burdens his religious practice by preventing Smith and his pastor from praying together and holding hands at the moment of his passing. (*See id*., pp. 10-13.)

Construing the facts in the Complaint in favor of Smith, as the court must do at this stage, and assuming the truthfulness of Smith's statements that he is a practicing Christian and that his request for his pastor to be physically present with him in the execution chamber is an important aspect of his faith, Smith has sufficiently pled a  RLUIPA violation. Smith has sufficiently alleged both that he wishes to engage in a religious practice and that the ADOC's blanket policy of

excluding spiritual advisors in the execution chamber will substantially burden his religious practice by preventing him from praying with and receiving comfort from his pastor in the final moments of his life. Because Smith's allegations plead a claim that is plausible on its face, the ADOC's motion to dismiss is due to be DENIED as to Smith's RLUIPA claim.

### 2. Smith's Emergency Motion for Preliminary Injunction

Smith argues that without this court's intervention, the ADOC will execute Smith in violation of his "statutorily . . . protected religious solace" under RLUIPA. (Doc. 4, p. 7.)  Smith points to his sincerely held religious beliefs, the ADOC's policy of disallowing all spiritual advisors in the execution chamber, and recent Supreme Court decisions to support his position that he would be successful on the merits of his claims. (Doc. 4, pp. 9-10, 12-17.)  The ADOC responds by arguing that Smith cannot meet the necessary elements for a preliminary injunction because Smith is not likely to succeed on the merits of his RLUIPA claim, will not suffer irreparable harm, and that the public's interest weighs in favor of denying injunctive relief. (Doc. 12, pp. 41-44.)

### a. *Likelihood of Success on the Merits*

As noted above, to succeed on the merits of his RLUIPA claim, Smith must show (1) that he will engage in a religious exercise, and (2) that his religious exercise will be substantially burdened. *See Adkins v. Kaspar,* 393 F.3d 559, 567 (5th Cir.

2004); 42 U.S.C. § 2000cc–1(a).  If Smith succeeds in demonstrating a *prima facie* case, the ADOC must then show that the challenged government action "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000cc–1(a), 2000cc–2(b). In contrast, if Smith fails to present evidence to support a *prima facie* case under RLUIPA, the court need not inquire into whether the governmental interest at stake is compelling. *See Midrash,* 366 F.3d at 1228.

### i.    Sincere Religious Practice

To succeed on his RLUIPA claim, Smith bears the initial burden of presenting evidence demonstrating that his observance of Christianity and his belief that his pastor's physical presence will provide comfort during his execution constitute a "religious exercise" under the statute. *See Adkins,* 393 F.3d at 567. A "religious exercise" is broadly defined under RLUIPA as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A).

Along with his motion, Smith submitted two declarations: one from Smith's attorney on Smith's behalf[14] and a second from Pastor Wiley. Smith's declaration

---

[14] Due to current COVID-19 safety protocols, the ADOC is not allowing in-person visitation at its penal facilities. As a result, Smith gave permission for his counsel to sign a sworn declaration on Smith's behalf to avoid "delay in his ability to bring a timely action." (*See* Doc. 4-1, p. 1.) Although attorney affidavits in this fashion are disfavored, under the current pandemic situation

avers that Smith is a devout Christian and has a close, spiritual connection with Pastor Wiley. (Doc. 4-1, p. 2.)  The declaration further states that Smith's faith teaches that the point of transition between life and death is important and that Smith believes Pastor Wiley can provide spiritual comfort in his final moments. (*Id*.)

In his declaration, Pastor Wiley submits that in the Christian faith, Christians provide strength and comfort to one another, adding that there is "no greater time to need that comfort than when . . . facing loss of your own life." (Doc. 4-2, p. 2.) Pastor Wiley further states that he shares Smith's belief that his physical presence inside the execution chamber will provide comfort and solace to Smith. (*Id*.)

In light of RLUIPA's all-encompassing definition of "religious exercise," Smith's declaration through his attorney, and Pastor Wiley's statements, this court concludes that Smith's practice of Christianity and his belief that his pastor should be physically present with him in the execution chamber constitute a "religious exercise" for purposes of a RLUIPA claim.

### ii.   Substantial Burden

The Eleventh Circuit has previously defined a "substantial burden" as including "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Midrash,* 366 F.3d at 1227.  Importantly,

---

and in the absence of an objection by the ADOC, the court will overlook the admissibility issues associated with such a filing.

the Circuit has made clear that, in order to constitute a "substantial burden" on religious practice, the government's action must be "more than . . . incidental" and "must place more than an inconvenience on religious exercise." *Id.* (citation omitted). Therefore, to constitute a substantial burden under RLUIPA, the governmental action must considerably hamper one's religious exercise.

"While it is true that courts are not to inquire into the centrality of a particular religious tenet in undertaking the substantial burden analysis, . . . at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice." *Allen,* 502 F.3d at 1278; *see also Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988) (indicating that, to constitute a substantial burden, the government action must do more than make it more difficult to practice one's religion, it should coerce individuals into acting contrary to their religious beliefs); *Adkins*, 393 F.3d at 569–70 (explaining that a substantial burden "pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs"); *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (defining substantial burden as an "oppressive" and "significantly great restriction or onus upon [religious] exercise"); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (holding that a substantial burden "necessarily bears

direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable").

Importantly, more is needed than the inmate's own statements to establish that one's religious practice is substantially burdened. Without evidence from outside, authoritative sources regarding the tenets and practices of a particular religion, a substantial burden may not be proven. *Allen*, 502 F.3d at 1277–80; *see also Smith v. Governor for Alabama*, 562 F. App'x 806, 813 (11th Cir. 2014); *Gelford v. Frank*, 310 F. App'x 887, 889 (7th Cir. 2008) (affirming denial of an inmate's claim for runes and other divination tools for the practice of Wicca on grounds that there was no formidable evidence of a substantial burden, only the inmate's "unreasoned say-so") (citing *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006)).

The Eleventh Circuit case of *Smith v. Allen* provides guidance to this court's analysis of the instant case. The plaintiff in that case, also a prisoner, requested permission to possess a small quartz crystal for use in his practice of Odinism. After reviewing materials relevant to the principles of Odinism, the prison's chaplain found no evidence of the need for a crystal in practicing the religion, and as a result, the use of the crystal was denied. *Allen,* 502 F.3d at 1277. The Eleventh Circuit agreed, holding that the plaintiff had presented "no evidence to demonstrate that a . . . crystal was fundamental" to his religious practice such that the denial "effectuated any more than an inconvenience on his religious exercise." *Id.* at 1278.

18

Consequently, the court held that the plaintiff had failed to establish a *prima facie* case that the practice of his religion was substantially burdened. *Id.* at 1279.

The Eleventh Circuit similarly denied the plaintiff's other claims regarding the denial of a designated area of worship and the denial of a small fire pit instead of the candle he was provided, noting the plaintiff failed to provide evidence from any outside sources to establish that either was necessary to the practice of his religion. *Id.* at 1279–80; *see also Muhammad v. Sapp*, 388 F. App'x 892, 896 (11th Cir. 2010) (finding no substantial burden with regard to Muslim inmate's not receiving a Qibla compass because no evidence was proffered to establish that the compass was fundamental to his practice of Islam); *Adams v. Mosley*, No. 2:05CV352-MHT, 2008 WL 4369246, at *11 (M.D. Ala. Sept. 25, 2008) (same with regard to inmate seeking to use tobacco, instead of an herbal substitute, for use in the practice of his Native American religion); *Avila v. McDonough*, No. 3:05CV280/LAC/EMT, 2007 WL 2480246, at *7 (N.D. Fla. Aug. 30, 2007) (finding no substantial burden with regard to inmate's request for specific beads in the practice of his Santerían faith when other types of beads were allowed to him); *Krieger v. Brown*, No. 5:08-CT-3090-FL, 2010 WL 4026090, at *5 (E.D.N.C. Oct. 13, 2010) (same with regard to denial of an outdoor worship circle for an inmate's practice of Asatru).

In the instant case, Smith submitted two declarations as evidence in support of his motion for preliminary injunction.  Both declarations describe Smith's belief

that Pastor Wiley's presence in the execution chamber will provide comfort to Smith at the time of his execution. (*See* Docs. 4-1, 4-2.)  After oral argument was heard in this case, this court gave the parties leave to file additional evidence in support of their respective positions. (*See* Docs. 20, 23.) While Smith did file additional evidence, his submissions were directed toward challenging the ADOC's compelling interest in the security of its executions and whether its practice of prohibiting all persons, including spiritual advisors, inside the execution chamber was the least restrictive means of addressing those security concerns. (*See generally* Doc. 26.) Smith provided the court with no supplementary resources that speak to the potential burden the ADOC's protocol would have on his religious practice. As a result, the court is left to solely rely on the two declarations to determine whether a substantial burden exists.

In his declaration, Smith contends that Pastor Wiley's physical presence inside the execution chamber during his execution would "provide him spiritual comfort and help relieve his struggle as he passes, including by holding his hand, praying with him in his final moments, and easing the transition between the worlds of the living and the dead." (Doc. 4-1, pp. 2-3.) Similarly, Pastor Wiley's declaration highlights the need for Christian believers to comfort one another, particularly in difficult moments such as facing one's own death. (Doc. 4-2, p. 2.) Pastor Wiley agrees that his presence in the execution chamber will give Smith "comfort and

solace as he leaves the physical world and enters the afterlife." (*Id.*)

While these declarations certainly speak to Smith's beliefs as a practicing Christian and his desire for comfort and spiritual guidance during his execution, this evidence is not sufficient to prove a substantial burden on Smith's religious practices. Smith has only expressed a *preference* for Pastor Wiley's presence in the execution chamber; he has provided the court with no evidence that the ADOC's policy *substantially* burdens his religious exercise or prevents him from participating in an integral component of his faith.

The case of *Smith v. Allen* is again instructive here. There, the plaintiff argued that the prison's outright denial of his request for an accommodation in accordance with his sincerely held religious beliefs was enough, standing alone, to demonstrate a substantial burden on his religious exercise. *Allen*, 502 F.3d at 1277. The Eleventh Circuit decidedly rejected this argument:

> Such an expansive reading of section 3, however, would require us to find a substantial burden whenever *any* request in connection with a sincere religious belief was denied by a state prison. If the word "substantial" in the statutory phrase "substantial burden," 42 U.S.C. § 2000cc–1(a), is to retain any meaning, it must, at a minimum, be construed as requiring something more than solely the denial of a request that is sincere. An alternate approach, like the one advocated by Smith, would result in the word "substantial" in § 2000cc–1(a) as being mere surplusage, since every governmental action denying a requested item to be used in religious observance would give rise to a *prima facie* RLUIPA claim. We decline to adopt such an expansive reading of section 3 of RLUIPA.

*Id.* at 1278.

Similarly, Smith, the plaintiff here, has provided the court with evidence of his sincere belief and of the ADOC's refusal to allow his pastor's presence inside the execution chamber. But this alone is simply insufficient to demonstrate that the ADOC's policy is more than an incidental burden on Smith's religious exercise. Smith is still free to fully engage in the practices of his faith. Crucially, the ADOC's policy allows Smith to have in-person contact visits with his pastor in the days and moments leading up to his execution. (Doc. 27-6.) The two may pray together, touch one another, and study spiritual text together. In fact, on the day of his execution, Pastor Wiley will be permitted to visit with Smith and remain with him in his cell. (*Id.*) The two will be separated only when it is time for Smith to enter the execution chamber, a matter of only minutes before the actual execution proceeds. (*Id.*) Then, at the moment of execution, the ADOC's policy allows Pastor Wiley to observe the execution from the viewing room, mere feet away from Smith and separated only by a pane of glass, in full view of each other.[15]

Smith has provided no evidence that either he or Pastor Wiley is prevented from praying during the execution, or that they will not be in the presence of each another, or that Smith cannot see Pastor Wiley in the viewing room during the execution. He also has not shown that the ADOC's policy will coerce him to violate

---

[15] *See* ADOC EXECUTION PROCEDURES 6, 7, note 7, *supra*; *see also* Doc. 27-4.

his beliefs, to forego a fundamental religious tenet, or to render the performance of a religious exercise essentially impracticable. Smith does not claim, for example, that absent Pastor Wiley's presence in the execution chamber, God will not hear Smith's prayers of repentance, or that without Pastor Wiley holding his hand at the moment of death, Smith's soul would not pass to heaven. In short, Smith has not demonstrated that the ADOC's policy would amount to more than an inconvenience or hindrance in the exercise of his Christian faith. As a result, this court finds that Smith has failed to show how the ADOC's policy will substantially burden his religious exercise.

### iii.    Compelling Governmental Interest

Even if Smith was able to demonstrate a substantial burden on his religious exercise, the ADOC nonetheless has a compelling interest in protecting the safety, security, and solemnity of the chamber, its occupants during an execution, and the execution process itself.

The death penalty is unquestionably a highly controversial topic, attracting proponents and opponents world-wide.  And executions themselves are inherently emotionally charged events, which create the need for increased security and heightened safety precautions for everyone involved with an execution: prison personnel, witnesses viewing the execution, and the inmate himself.

Smith contends that the ADOC's previous, long-standing practice of allowing

the ADOC-employed institutional chaplain into the execution chamber shows that granting his request would have no significant impact on the ADOC's interest in security.  (Doc. 4, p. 15.)  In response, the ADOC argues that its policy "serves the compelling government interest of maintaining security and solemnity during executions." (Doc. 12, p. 42.)

Although the ADOC bears the burden of proof on the compelling interest and least restrictive means prongs of RLUIPA, RLUIPA's legislative history clearly indicates that prison officials are entitled to due deference on issues relating to "good order, security and discipline, consistent with consideration of costs and limited resources." S. REP. NO. S7775 (July 27, 2000); s*ee also Cutter v. Wilkinson*, 544 U.S. 709, 716-17 (2005) (Congress "anticipated . . . that courts entertaining complaints under [RLUIPA] would accord 'due deference to the experience and expertise of prison and jail administrators.'") (quoting 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sens. Hatch and Kennedy)).  However, this deference is not absolute and "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." *Benning v. Georgia*, 845 F. Supp. 2d 1372, 1382 (M.D. Ga. 2012) (citing 146 Cong. Rec. S7774–01, *S7775 (July 27, 2000)).

The ADOC has submitted evidence in support of its compelling interest argument, including affidavits of ADOC employees, copies of ADOC administrative

regulations, and excerpts of deposition testimony taken in a similar case[16] currently being litigated in this court. (Doc. 27.)

In her affidavit, the ADOC's Assistant Deputy Commissioner of Operations described the ADOC's policies and security practices surrounding executions. (Doc. 27-6.) These "heightened security measures" are implemented from the time an execution is announced and include the placement of the inmate on "single-walk" status where he is prohibited from interacting with other inmates. (*Id.*, pp. 4-5.) Further, during the week leading up to an execution, the ADOC retains an outside security team to guard the penal facility, and local law enforcement is alerted to the impending execution. (*Id.*, p. 5.)  The condemned inmate is also moved to a separate holding cell, is observed around the clock, and his visitation is held in a separate area under the constant supervision of correctional officers. (*Id.*)  On the day of the execution, both Holman and nearby Fountain Correctional Facility go into lockdown. (*Id.*)  And the outside security team provides protection outside the facility while the execution team closely monitors the inmate and his final visitors inside the facility. (*Id.*, pp. 5-6.)

The ADOC contends it is concerned not only with interference from outside

---

[16] Similar claims are being made by a Muslim death row inmate in the matter styled *Charles L. Burton, Jr. v. Jefferson Dunn, et al.*, Case No. 2:19-cv-242-RAH (M.D. Ala. 2019). As of the date of this order, the parties in that matter are in the final stages of briefing their respective summary judgment motions.

the prison, but also with those individuals who participate in the execution itself. In this regard, the ADOC's protocol provides that only members of the trained execution team are allowed inside the execution chamber during the execution.[17] (*See* Doc. 27-6.) These individuals have not only undergone the standard ADOC employee background investigation process, but they have been personally selected by the warden based on their experience and demonstrated trustworthiness during their time as ADOC employees. (*Id*., pp. 6-7.)  These individuals are trained in the ADOC's execution protocol and take part in an in-person walk-through of the execution procedure before carrying out each execution. (Doc. 26-13, p. 3.)  As a result of this vetting, training, and demonstrated trustworthiness, the execution team constitutes the only individuals permitted by the ADOC protocol to be present in the chamber during the execution; all other individuals are excluded, including the warden himself, the ADOC Commissioner, other ADOC employees, and ADOC legal counsel. (*See generally* Doc. 27.)  The ADOC credits this exclusionary policy with its demonstrated history of secure, efficient, and dignified executions. (Doc. 27-9, p. 9.)

---

[17] If a condemned inmate is being executed by lethal injection, the ADOC uses an "IV Team" consisting of non-ADOC medical personnel that the ADOC selects. (Doc. 27-9, pp. 12-13.) This team is escorted into the chamber once the inmate is strapped to the gurney and starts the inmate's IV, but these individuals are not permitted to remain in the execution chamber during the execution itself. (*Id*., pp. 12-15.) The members of this team also undergo standard ADOC employee background checks. (*Id*., p. 14.)

The ADOC further argues that these strict security measures largely result from both anticipated and actual disturbances[18] leading up to scheduled executions. The ADOC notes, for example, that during the 2010 execution of Holly Wood, his sisters, who were seated in the viewing room, "began to scream and violently bang on the glass window" of the execution chamber. (Doc. 27-6, pp. 8-9.)  In 2017, during the execution of Torey McNabb, McNabb's brother threatened law enforcement, his mother had to be reprimanded for her behavior in the viewing room, and McNabb used his final words to curse the ADOC. (*Id.*, p. 9.)  That same year, death row inmates at Holman protested a fellow inmate's execution by staging "a coordinated refusal to obey orders." (*Id.*, p. 5.)  Then, in 2019, in the moments before the execution of Christopher Price, Price refused to leave his cell and enter the execution chamber, threatening to "take out" anyone who came into his cell, thereby resulting in his forced extraction. (*Id.*, pp. 6, 8.)

Despite these incidents involving non-ADOC employees, Smith argues that the ADOC's history of allowing an ADOC-employed prison chaplain in the execution chamber undercuts the ADOC's argument that the presence of a spiritual

---

[18] The ADOC focuses its argument on the security concerns that arise from having a free-world advisor of the inmate's choosing inside the execution chamber.  The ADOC has not claimed an interest attendant to issues associated with a medical complication from the execution itself, such as the one mentioned by Justice Kavanaugh in his concurrence in *Murphy v. Collier*, ___ U.S. ___, 139 S. Ct. 1475 (2019) ("Things can go wrong and sometimes do go wrong in executions, as they can go wrong and sometimes do go wrong in medical procedures. States therefore have a strong interest in tightly controlling access to an execution room in order to ensure that the execution occurs without any complications, distractions, or disruptions.").

advisor implicates a compelling security interest. But the ADOC also has presented evidence showing that security concerns exist even with ADOC-employed chaplains and religious volunteers. Holman's long-serving chaplain provided testimony that a previous prison chaplain was fired after smuggling contraband into the prison. (Doc. 27-8, pp. 33.) The chaplain further testified that multiple religious volunteers have been reprimanded or banned from returning to the prison for breaking prison rules. (*Id.*, p. 36.) Thus, the ADOC posits that even ADOC-employed or affiliated chaplains can pose a risk inside the prison.

For his part, Smith has submitted a report and testimony from Emmitt Sparkman, a correctional consultant with more than four decades of experience. After reviewing the ADOC's protocol and practices, Sparkman opines that allowing an inmate's chosen spiritual advisor to be present in the execution chamber during the execution creates no heightened security risk. (Doc. 26-7.) Smith also presents evidence indicating that two states and the Federal Bureau of Prisons (BOP) previously have allowed non-employee spiritual advisors in their execution chambers during an execution.[19] (Docs. 26-5 and 26-10.)

---

[19] In fact, both parties have noted the federal BOP's recent practice of allowing non-employee spiritual advisors inside the BOP's execution chamber. Smith argues that this practice indicates a lack or nonexistence of a security concern. Neither party, however, has provided the court with detailed information regarding the BOP's practice or policy, the security measures the BOP implements prior to approving an advisor's presence, the timeline and procedure of selecting and approving an advisor, the details of what a spiritual advisor can and cannot do inside the chamber or where the advisor can stand, or what measures BOP has in place inside the execution chamber to account for the risks presented by an outside individual's presence at the time of execution.

Smith's evidence, viewed against the ADOC's evidence, however, fails to convince the court that the ADOC does not have a compelling security interest in tightly controlling access to the execution chamber during an execution.[20] Indeed, the ADOC has a compelling governmental interest "of the highest order" in preserving the solemnity, safety and security of its executions as well as a "moral obligation to carry out executions with the degree of seriousness and respect that the state-administered termination of human life demands." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)); *Jackson v. Danberg*, 594 F.3d 210, 230 (3d Cir. 2010).

Given the evidence concerning security threats during executions—both experienced and anticipated—the vetting of execution team members, and the history of disciplinary problems with ADOC-employed chaplains and religious volunteers, combined with the inherently emotional nature of executions, the court finds that the ADOC has a compelling interest in maintaining safety, security, and solemnity during its executions, including what transpires during the execution and

---

[20] To be clear, the mere claim of a compelling interest by the ADOC does not automatically defeat Smith's interests. *Holt v. Hobbs*, 574 U.S. 355, 363–64 (2015). The court has carefully considered the evidence and balanced the interests of the parties; it has not simply deferred to the ADOC.

who is allowed inside the execution chamber.[21]

### iv.   Least Restrictive Means

RLUIPA "makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress." *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal,* 546 U.S. 418, 434 (2006). This test requires the ADOC "not merely to explain why it denied the exemption but to prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest." *Holt v. Hobbs*, 574 U.S. 355, 364 (2015). Nothing within the Supreme Court or Eleventh Circuit's RLUIPA decisions appear to suggest, however, that prison officials must refute every conceivable option to satisfy the least restrictive means requirement.

The ADOC submits that its current protocol excluding all individuals, including spiritual advisors regardless of faith or employer, from the execution chamber is the least restrictive means of advancing its compelling interest in the

---

[21] The district court in *Gutierrez* reached the opposite conclusion. There, the district judge noted that the TDCJ had presented no evidence of security breaches by chaplains while in the execution chamber and failed to submit any evidence of disruptions caused by spiritual advisors. The *Gutierrez* court found that TDCJ's security concerns were, therefore, too abstract and not sufficiently ripe. *Gutierrez v. Saenz*, Case No. 19-cv-185 (S.D. Tex. 2019), Doc. 124, p. 17. Importantly, though, Texas, like Alabama, has never allowed spiritual advisors inside the execution chamber. Consequently, neither defendant would conceivably be able to provide evidence of how free-world spiritual advisors might conduct themselves during an execution. Further, in the instant case, the ADOC has submitted evidence of security breaches (albeit not inside the execution chamber) by both religious volunteers and an ADOC-employed chaplain. This court is satisfied that ADOC has shown that security concerns exist if an inmate's chosen spiritual advisor is allowed inside the chamber.

safety, security, and solemnity of executions.  As it concerns spiritual advisors, the ADOC has submitted evidence in the form of an affidavit from its long-serving chaplain explaining the four levels of classification for individuals authorized to provide pastoral or spiritual services at Holman. (*See* Doc. 27-7.) The first and highest level is the institutional chaplain, an ADOC employee subject to education, experience, and reference requirements, and who must go through interview procedures and a background investigation. (Doc. 27-7, p. 3.) Institutional chaplains participate in numerous training programs, both after they are initially hired and annually, including those on prison culture and sexual harassment, among others. (Doc. 27-8, pp. 9-25.) The second level is an assistant chaplain. These individuals are not ADOC employees, but are nonetheless subject to a full background investigation and required training. (Doc. 27-7, p. 3.) The third classification level is for volunteers, also non-ADOC employees. These individuals also must undergo a background investigation and complete a training program. (*Id*.)

The final level are spiritual advisors, who are likewise non-ADOC employees and are subject to background investigations akin to those conducted for visitors at the facility. (Doc. 27-6, p. 7; Doc. 27-7, pp. 3-4.) These advisors can be anyone the inmate chooses, even a family member, and do not have to be ordained or educated in any particular religion. (Doc. 27-8, p. 39.) Spiritual advisors previously unaffiliated with Holman are treated as visitors on the premises and do not undergo

any training. (Doc. 27-7, p. 4.)

The ADOC contends that its relaxed requirements for spiritual advisors give death-sentenced inmates the maximum possible freedom in choosing the person they wish to provide comfort and guidance in the inmate's final days and hours. The ADOC argues that allowing a free-world advisor not previously known to the ADOC inside the execution chamber would require a heightened background investigation to evaluate the advisor's "character, ability to follow orders, and connection to the inmate . . . ." (Doc. 27-6, p. 10.)   Holman's chaplain testified that background investigations of ADOC employees sometimes take months to complete. (Doc. 27-8, pp. 6-7.)  Consequently, there is no guarantee that an inmate's chosen advisor could undergo a more extensive background investigation in time to be present at the execution.  Subjecting spiritual advisors to interviews, training, and heightened background investigation procedures, or requiring advisors to prove a certain level of education and experience, has the potential to restrict which individuals could be approved as spiritual advisors.  There is also no guarantee that an inmate's chosen spiritual advisor will pass a background check or vetting.[22]  The ADOC tries "to give the inmate as much latitude as possible in selecting a spiritual advisor." (Doc. 27-6,

---

[22] This raises an entirely different set of issues; that is, what happens if the ADOC refuses entry of a particular spiritual advisor who cannot pass even a minimal background check and vetting.  No evidence is presented by either party of whether Pastor Wiley would or would not pass a heightened background check and what a background check might reveal.

p. 10.) Additional vetting, which might limit an inmate's choice of spiritual advisor, would not further this end.

The ADOC further argues that its less-restrictive standard for spiritual advisors allows an inmate to make an "eleventh-hour change of religion." (Doc. 27-6, p. 10.)   In her affidavit, the ADOC's Assistant Deputy Commissioner of Operations notes that inmates are not "held to their initial declaration of faith."[23] (*Id*.) Should an inmate decide to change his religious affiliation in the days or weeks leading up to his execution, this change would make the last-minute screening of his spiritual advisor unfeasible. The ADOC also notes that its inmates are affiliated at least "a dozen or more" faiths, making hiring and vetting chaplains of every specific faith financially and logistically impracticable. (*Id*.)

Based on the current record, it appears substantially unlikely that the ADOC could further its compelling security interest while allowing untrained, "free-world" spiritual advisors to be physically present inside the execution chamber. The ADOC's evidence indicates that it has considered alternatives, such as heightened background investigation procedures, but found those alternatives to be more

---

[23] Because an inmate may choose to alter his religious beliefs ahead of his execution, the inmate may also be permitted to choose a different spiritual advisor affiliated with his newly adopted faith. This same policy would also allow an inmate to change his spiritual advisor if, for example, his spiritual advisor was to become sick or otherwise become unable to attend an execution due to last-minute issues.  Thus, for example, if the inmate's spiritual advisor suddenly becomes quarantined due to COVID-19 exposure, the inmate still would be able to designate someone else in his place who can view the execution from the viewing chamber. That circumstance becomes very different if the change-out involves someone who is permitted inside the execution chamber.

restrictive of the inmate's ability to freely choose his spiritual advisor. The court finds that the ADOC has established that there is no less-restrictive means of furthering its compelling governmental interests. Its interests in safety, security and solemnity in executions are so strong that it cannot permit even a slight chance of interference with an execution inside the chamber.

All told, the court finds—for the purposes of the preliminary injunction—that Smith has failed to demonstrate a substantial burden on his religious exercise, while the ADOC has met its burden of showing that it employs the least restrictive means of furthering its compelling safety, security and solemnity interest. As a result, Smith is unlikely to succeed on the merits of his RLUIPA claim.

## B. First Amendment Claims

In addition to his RLUIPA claim, Smith asserts that the ADOC's policy and actions violate both the Establishment Clause and the Free Exercise Clause of the First Amendment. Because RLUIPA "provide[s] greater protection for religious exercise than is available under the First Amendment," *see Holt*, 135 S. Ct. at 859-60, if a prison's regulation passes muster under RLUIPA, it will necessarily satisfy the requirements of the First Amendment. *Allen,* 502 F.3d 1281 n. 5 (citing *Charles v. Frank,* 101 F. App'x 634, 635 (7th Cir. 2004) (per curiam)).   Nonetheless, the court will address Smith's First Amendment claims in turn.

**1. Establishment Clause**

The question Smith presents is whether the ADOC's amended policy which prohibits all inmates from having anyone, including a spiritual advisor of his choosing, inside the execution chamber with him at the moment of execution is violative of the Establishment Clause.  (Doc. 1, pp. 16-18.)   In his Emergency Motion for Preliminary Injunction, Smith contends he has a substantial likelihood of prevailing on the merits of this claim because the "ADOC's policy erects a barrier between prisoners and the exercise of their religious beliefs."  (Doc. 4, p. 19.)  The ADOC asserts the Establishment Clause claim should be dismissed pursuant to Rule 12(b)(6) because Smith has failed to state a claim upon which relief can be granted. (Doc. 12, p. 32.)

The Establishment Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. "This restriction has been made applicable to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1284 (11th Cir. 2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). "The Establishment Clause applies not only to state statutes but acts and decisions of individual governmental actors" as well. *Id*. (citing *Lee v. Weisman*, 505 U.S. 577, 587 (1992)).

The Establishment Clause prohibits governmental entities from preferring one

religion over another religion, but also prevents the creation of laws that demonstrate hostility toward religion. *See American Legion v. American Humanist Assoc.*, ___ U.S. ___, 139 S. Ct. 2067, 2074 (2019); *Van Orden v. Perry*, 545 U.S. 677, 683-84 (2005); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 845-46 (1995); *Larson v. Valente*, 456 U.S. 228, 246 (1982).

The parties agree that the constitutional standard set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), applies to Smith's Establishment Clause claim. (Doc. 12, p. 33.)  To survive an Establishment Clause challenge under the *Lemon* test, (1) the government activity in question must have a secular purpose, (2) its principal or primary effect must be one that neither advances nor inhibits religion, and (3) it must not foster an excessive entanglement with religion.  *Lemon*, 403 U.S. at 612-13.[24]

The ADOC argues the absence of any and all persons, including spiritual advisors, meets all three prongs of the *Lemon* test because (1) the amended policy excluding all outside individuals, including spiritual advisors, family members, friends, and other ADOC employees, from the execution chamber furthers the policy of "maintaining security in the chamber and the solemnity of the event"; (2) the

---

[24] This court recognizes the *Lemon* test is not applicable to certain Establishment Clause challenges.  *See American Legion v. American Humanist Assoc.*, ___ U.S. ___, 139 S. Ct. at 2086-2089 (a plurality rejected the *Lemon* test in claims involving religiously expressive monuments, symbols, and displays); *Lamb's Chapel v. Center Moriches Sch. Dist.,* 508 U.S. 384, 395 n. 7 (1993) (noting that despite heavy criticism of the *Lemon* test, it has not been overruled).

primary effect is to maintain the safety, security and solemnity of the execution and, therefore, the amended policy does not advance or inhibit religion; and (3) the policy disentangles the government from religion by removing all clergy and spiritual advisors from the chamber. (Doc. 12, p. 33.)

Smith does not dispute that the ADOC's amended policy generally meets the first and third prongs of the *Lemon* test.  Instead, he argues that the policy does not satisfy the second prong.  Smith attests that the primary effect of the ADOC's prohibition of an inmate's chosen spiritual advisor in the execution chamber will inhibit the practice of his religious beliefs.  (Doc. 13-1, p. 18.)  The ADOC maintains that the primary effect of the amended policy is to further the safety, security and solemnity of the execution. (Doc. 12, p. 33.)  The effects prong of the *Lemon* test "asks whether, irrespective of [the] government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion. *Wallace v. Jaffree*, 472 U.S. 38, 56 n. 42 (1985) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)).

There is no dispute that the ADOC removed its institutional chaplain from the execution chamber in response to recent litigation concerning the presence of its chaplain during executions. (*See* Doc. 12, p. 12.)  In *Ray v. Commissioner, Alabama Department of Corrections*, 915 F.3d 689 (11th Cir. 2019), Muslim inmate Domineque Ray requested the presence of his imam inside the chamber to provide

spiritual guidance at the time of his death.  He also objected to the presence of the ADOC-employed Christian chaplain in the execution chamber. The ADOC agreed to remove the chaplain but refused to grant the request for the presence of Ray's imam.  On February 6, 2019, the Eleventh Circuit determined that Ray's challenge to the ADOC policy of allowing the presence of the ADOC chaplain in the execution chamber while refusing to allow his free-world imam in the chamber demonstrated a "powerful Establishment clause claim." 915 F.3d at 695.  Strongly criticizing the State of Alabama for its actions, the Eleventh Circuit held that the ADOC's policy (at that time) "facially further[ed] a denominational preference" *Id*. at 697.

After concluding that "Alabama appears to have set up 'precisely the sort of denominational preference that the Framers of the First Amendment forbade,'" the Court found Ray had demonstrated a substantial likelihood of success on the merits of his Establishment claim and granted an emergency motion for a stay.  *Id*. at 697-98 (quoting *Larson*, 456 U.S. at 255).  Due to the last-minute nature of the application, however, the Supreme Court vacated the Eleventh Circuit's imposition of the stay.  *Dunn v. Ray*, ___ U.S. ___, 139 S. Ct. 661 (2019).  Ray ultimately was executed with no spiritual advisor of any sort inside the execution chamber.

The following month, the Supreme Court granted a stay to Texas inmate Patrick Murphy, a Buddhist who had requested that his chosen spiritual advisor or a

comparable Buddhist advisor be present with him in the execution chamber.[25]
*Murphy v. Collier*, ___ U.S. ___, 139 S. Ct. 1475 (2019) (Kavanaugh, J.,
concurring).  Murphy challenged Texas' policy that allowed either the prison's
Christian or Muslim state-employed chaplain to be present but excluded all other
spiritual advisors. In his concurrence, Justice Kavanaugh stated:

> In an equal-treatment case of this kind, the government
> ordinarily has its choice of remedy, so long as the remedy
> ensures equal treatment going forward. *See Stanton v. Stanton*,
> 421 U.S. 7, 17–18 (1975). For this kind of claim, there would be
> at least two possible equal-treatment remedies available to the
> State going forward: (1) allow all inmates to have a religious
> adviser of their religion in the execution room; or (2) allow
> inmates to have a religious adviser, including any state-
> employed chaplain, only in the viewing room, not the execution
> room. A State may choose a remedy in which it would allow
> religious advisers only into the viewing room and not the
> execution room because there are operational and security issues
> associated with an execution by lethal injection. Things can go
> wrong and sometimes do go wrong in executions, as they can go
> wrong and sometimes do go wrong in medical procedures.
> States therefore have a strong interest in tightly controlling
> access to an execution room in order to ensure that the execution
> occurs without any complications, distractions, or disruptions.
> The solution to that concern would be to allow religious advisers
> only into the viewing room.
>
> In any event, the choice of remedy going forward is up to the
> State. What the State may not do, in my view, is allow Christian
> or Muslim inmates but not Buddhist inmates to have a religious
> adviser of their religion in the execution room.

---

[25] Murphy filed his request for a religious accommodation with the TDCJ one month in advance
of his execution. *Murphy*, 139 S. Ct.  at 1477.

*Murphy v. Collier*, 139 S. Ct. at 1475-1476 (Kavanaugh, J., concurring in grant of application for stay on March 28, 2019).

On April 2, 2019, five days after the Supreme Court granted a stay in *Murphy*, Texas changed its policy to exclude all spiritual advisors, including those employed by the state of Texas, from the chamber; they could, however, view the execution from the viewing room. *Id*. at 1476.  On May 13, 2019, in a statement concerning Justice Alito's dissent, Justice Kavanaugh suggested that "[t]he new policy solves the equal-treatment constitutional issue" and suggested that "the prompt resolution of a significant religious equality problem with the State's execution protocol . . . should alleviate any future litigation delays or disruptions that otherwise might have occurred as a result of the State's prior discriminatory policy." *Id.* (Kavanaugh, J., statement, joined by Roberts, C.J.).

In April 2019, relying on Justice Kavanaugh's concurrence in *Murphy*, the ADOC likewise amended its execution protocol to remove the required presence of its institutional chaplain inside the execution chamber. (Doc. 12, p. 12.)  Now, no spiritual advisors, regardless of faith, employer, or security risk, are allowed inside the chamber.  Smith argues that the ADOC's attempt to cure one constitutional infirmity "created a new one: it has the primary effect of inhibiting religious practice." (Doc. 4, p. 19.)  Specifically, he argues the ADOC's amended policy erects

a barrier between prisoners and the exercise of their religious beliefs, including Smith's own. (*Id.*)

The ADOC maintains that the amended policy meets the second prong of the *Lemon* test because the primary effect of the policy is to further the safety, security and solemnity of an execution.  (Doc. 12, p. 33.)  The prohibition of spiritual advisors inside the execution chamber neither advances nor inhibits any particular religion because, as alleged in the Complaint, a condemned inmate is allowed to visit with his spiritual advisor of choice just before entering the execution chamber and is free to pray in the moments before his death.  The amended policy allows no one in the execution chamber at the moment of execution, including family members, friends and other ADOC employees.  Everyone is excluded, except for those who serve on the execution team.

The facts presented in this case demonstrate that the ADOC's amended policy does not have the primary effect of inhibiting religion. A condemned inmate is permitted to visit and pray with his spiritual advisor before he enters the execution chamber. The advisor is also allowed to watch the execution from the viewing room and pray for the inmate during the execution, only a few feet away and separated only by security glass.  Although an inmate and his spiritual advisor are unable to touch or hold hands, they can see each other just as the inmate can do with any friend or family member who also attends.  Thus, it is clear the primary effect of the

amended policy neither advances nor inhibits religion. *See Bown v. Gwinnett Cty. Sch. Dist.*, 112 F.3d 1464, 1472 (11th Cir. 1997) (determining that statute requiring moment of silence in school did not have the primary effect of advancing or inhibiting religion).

On the face of the Complaint, Smith has failed to allege facts demonstrating the ADOC's amended policy prohibiting spiritual advisors in the execution chamber itself is hostile to religion. Instead, if the amended policy does anything, it removes an unconstitutional exception to an otherwise religion-neutral policy of general exclusion. Consequently, the ADOC's motion to dismiss pursuant to Rule 12(b)(6), is due to be GRANTED as to the Establishment Clause claim. Moreover, even assuming Smith pled sufficient facts, this court concludes that Smith is unlikely to prevail on the merits of his Establishment Clause claim.

### 2. Free Exercise Clause

Smith asserts the ADOC's amended policy is also violative of the Free Exercise Clause. Specifically, Smith states the amended policy constitutes a policy that is hostile toward religion. (Doc. 1, p. 19.) The ADOC argues that this court should dismiss the free exercise claim pursuant to Rule 12(b)(6) because Smith has failed to state a claim upon which relief can be granted. (Doc. 12, p. 32.)

"First Amendment Free Exercise Clause precedent is clear: a plaintiff must allege a constitutionally impermissible burden on a sincerely held religious belief to

survive a motion to dismiss." *GeorgiaCarry.Org., Inc. v. Ga.,* 687 F.3d 1244, 1256 (11th Cir. 2012). "This is so because, as a threshold issue—before a court even considers whether a law is subject to the rational basis test or, alternatively, strict scrutiny—a court must be able to determine that the protection of the Free Exercise Clause is triggered." *Id.* "To plead a valid free exercise claim, [a plaintiff] must allege that the government has impermissibly burdened one of his 'sincerely held religious beliefs.'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1294 (11th Cir. 2007) (citation omitted). A plaintiff must allege "'enough factual matter (taken as true) to suggest' that his religious belief [is] sincerely held . . . 'plausible grounds to infer' that it [is] sincerely held . . . and 'identify[ ] facts that are suggestive enough to render [the sincerity of his belief] plausible [ ]' . . . . That is all that is required at this stage of the litigation." *Id.* at 1296 (alteration in original) (citations omitted).  Smith has sufficiently pled his claim that the amended ADOC policy precludes his sincere desire to have a spiritual advisor present inside the chamber during his execution. Thus, the ADOC's motion to dismiss the free exercise claim pursuant to Rule 12(b)(6) is due to be DENIED.

Because the ADOC also argues the Emergency Motion for Preliminary Injunction is due to be denied, the court must now determine the likelihood of Smith prevailing on the merits of his Free Exercise Clause claim.

While prisoners retain First Amendment rights, including the First

Amendment right of free exercise of religion, *see Cruz v. Beto*, 405 U.S. 319, 322 (1972) (*per curiam*), prison regulations or policies "alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (holding that the *Turner v. Safley* standard of review is applicable to claims that an inmate's free exercise rights have been violated). Courts must give respect and deference to the judgment of prison administrators in considering First Amendment challenges raised within the confines of prisons or jails. *O'Lone*, 482 U.S. at 350.

The *Turner* standard of review requires the court to uphold prison regulations if they are "reasonably related to legitimate penological interests." *O'Lone*, 482 U.S. at 350 (determining that *Turner v. Safley*'s "reasonableness" test is appropriate to claims of "alleged infringements of fundamental constitutional rights."). Thus, "[a] prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable." *Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000), *cert. denied*, 532 U.S. 932 (2001) (holding that policy which precluded use of a "dual-name" on inmate identification card violated inmate's right to the free exercise of religion by denying him his Muslim identity and was unreasonable under *Turner*).

The *Turner* standard employs four factors to determine the reasonableness of

44

a challenged prison regulation, rule, or policy. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (citing *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). The remaining three factors consider: "(2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an exaggerated response to prison concerns." *Hicks*, 223 F.3d at 1247-48 (quoted in *Johnson v. Brown*, 581 Fed. Appx. 777, 780 (11th Cir. 2014)).

### a. The Rational Connection to Security

The ADOC maintains there is a rational connection between the policy prohibiting non-employees, such as free-world spiritual advisors chosen by the inmate, from the execution chamber and the ADOC's need to provide a safe, secure, solemn, and respectful execution. (Doc. 12, pp. 39-40.)  Smith argues, however, that the policy evinces a hostility toward religion and is therefore not neutral.  (Doc. 13-1, p. 23.)

If the "asserted goal is so remote" from the policy such that it appears "arbitrary or irrational" or if the "governmental objective" is not a "legitimate and neutral one," the regulation or policy "cannot be sustained" as constitutional. *Turner*,

482 U.S. at 89-90.   Security is a compelling governmental objective. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).   The court also finds that maintaining solemnity of the execution proceeding is a compelling interest.

As previously discussed, the ADOC has presented sufficient evidence demonstrating the heightened security risks that exist during an execution and the rational reasons for allowing only necessary medical personnel and members of the execution team inside the chamber.   The ADOC has submitted evidence of outbursts from free-world visitors and at least one condemned inmate during an execution, as well as evidence of inmates making threats and staging protests in response to executions. And these are just documented disturbances that have occurred during executions over the previous ten years.   Common sense dictates that there are a multitude of other things that could go wrong from a safety and security standpoint, especially in an effort to stop an execution.   Distractions of this sort are disruptive and pose a substantial security risk to personnel performing the execution and undermine efforts to conduct an execution that is serious, dignified, and respectful, thereby preserving the solemnity of the proceeding.   As a result, the court finds that ADOC has provided a logical foundation for its amended policy banning all persons of the inmate's choosing, including spiritual advisors, from the execution chamber. Consequently, the first factor weighs in the ADOC's favor as security problems could conceivably arise when a free-world spiritual advisor of the inmate's choosing

is present during the execution process.

### b. Alternative Means

The ADOC asserts that Smith has alternative means of exercising his religious freedom because Smith is allowed religious reading materials, visits with his chosen spiritual advisor, and may otherwise practice his faith during the week leading up to his execution. Smith may also have an in-person contact visit with his spiritual advisor prior to entering the execution chamber where the two men may pray, study scripture, hold hands, and otherwise comfort each other. Smith and his pastor are also able to see each other through the viewing room window during Smith's execution, and both Smith and his spiritual advisor may pray throughout the execution process.  Because Smith has alternative means of practicing his faith, the court finds that this factor weighs heavily in favor of the ADOC.

### c. Accommodation of the Requested Right

The ADOC also asserts that accommodating Smith's request would create an unnecessary safety and security risk during the execution. The ADOC argues that free-world spiritual advisors of an inmate's choosing are neither investigated nor trained to the same degree as ADOC employees, nor are they vetted in the way members of the execution team are vetted.  The ADOC maintains it cannot exercise the same control over free-world spiritual advisors as it can with its own chosen employees. The ADOC further argues that, even if a spiritual advisor were to sign a

form agreeing to follow orders during an execution, there is no guarantee that a disturbance would not occur.  (Doc. 12, p. 40.)  The court recognizes that Smith's pastor has visited the prison on several occasions without incident. A routine visit, however, is different from allowing someone into the execution chamber while an inmate is being put to death. An execution involves heightened security during a highly emotional event and Smith's spiritual advisor is not beholden to the ADOC in any form.  Therefore, although the court affords some weight to Smith as to this factor, the balance ultimately weighs more heavily in favor of the ADOC.

### d.  Ready Alternatives

As to the final factor, the ADOC argues there are no ready alternatives to Smith's request for his spiritual advisor because the amended policy does not permit anyone inside the execution chamber except for members of the execution team. The ADOC notes that its policy is a reasonable regulation in the interest of safety, security, solemnity, and fairness to inmates of all faiths or no faith at all. The court agrees.

After weighing these four factors and recognizing that the ADOC's policy infringes on Smith's exercise of religion to some degree, the court concludes that Smith is unlikely to demonstrate that the ADOC's amended policy is "unreasonable." The ADOC has a legitimate governmental interest in tightly controlling access to its execution chamber during an execution, and the challenged

policy has a rational connection to that interest.  Smith's rights are necessarily limited by virtue of his incarceration, but he has not shown that he is unable to generally exercise his religious faith.  This court therefore concludes that Smith is unlikely to prevail on the merits of his Free Exercise claim.

## C.  The ARFA Claim

Smith also asserts the ADOC's policy violates the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. Art. I, § 3.01(V).  Specifically, he maintains that excluding his spiritual advisor from the execution chamber is a burden on his religion and is not the least restrictive means of furthering a compelling governmental interest. (Doc. 1, pp. 15-16.)  He also asserts that, because "[t]he ARFA analysis is essentially the same as that under RLUIPA – except a plaintiff is required to show only *any burden* on religion, rather than a 'substantial burden,'" he is substantially likely to prevail on his ARFA claim as well.  (Doc. 4, pp. 17-18 (emphasis added).)

The ADOC asks this court to decline to exercise supplemental jurisdiction as to the ARFA claim.  Alternatively, the ADOC contends this court should dismiss Smith's ARFA claim pursuant to Rule 12(b)(6) and that the motion for a preliminary injunction is due to be denied as well.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction

over a substantial federal claim and the federal and state claims must derive from a 'common nucleus of operative fact.'" *L.A. Draper & Son v. Wheelabrator Frye, Inc.,* 735 F.2d 414, 427 (11th Cir. 1984) (citation omitted). The exercise of supplemental jurisdiction is discretionary. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966).

Citing *Thai Meditation Association of Alabama, Inc. v. City of Mobile*, 980 F.3d 821 (11th Cir. 2020), the ADOC contends the exercise of supplemental jurisdiction is not appropriate because the Eleventh Circuit recently observed that there is limited Alabama case law interpreting ARFA and noting that its own interpretation of ARFA was its "best *Erie* guess." 980 F.3d at 837, 840. Although this court recognizes there are few Alabama court decisions interpreting or applying ARFA, it cannot ignore the Eleventh Circuit's holding and sound interpretation of the language of ARFA. Therefore, this court will exercise supplemental jurisdiction.

ARFA was ratified in 1998 and is codified at § 3.01 of the Alabama Constitution. ARFA's operative provision provides:

> (a) Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).
>
> (b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:
>
> > (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling interest.

Ala. Const. Art. I, § 3.01(V).

Because the language of this state constitutional provision essentially tracks that of RLUIPA, the court, at least in part, will interpret and apply this provision in light of case law decided under RLUIPA. *See Presley v. Scott*, No. 4:13-cv-02067, 2014 WL 7146837, at *24 (N.D. Ala. Dec. 15, 2014).

The same claims and issues raised in Smith's federal RLUIPA claim appear with respect to this state-law claim.  Construing the facts in the Complaint in favor of Smith, and assuming the truthfulness of Smith's statements that he is a practicing Christian and that his request for his spiritual advisor to be with him in the execution chamber is an important aspect of his faith, Smith has established a *prima facie* ARFA violation.  Smith has sufficiently alleged both that he wishes to engage in a religious exercise and that the ADOC's policy of disallowing all individuals, including spiritual advisors, from inside the execution chamber burdens his religion by preventing him from praying with and receiving comfort from his pastor in his final moments of life. Because Smith's allegations plead a claim that is plausible on its face, the ADOC's motion to dismiss is due to be DENIED as to Smith's ARFA claim. The court now turns to Smith's request for preliminary injunctive relief.

### 1.  The Burden on Religious Exercise

ARFA's purpose "is to guarantee that the freedom of religion is not burdened by state and local law; and to provide a claim or defense to persons whose religious freedom is burdened by government." Ala. Const., § 3.01, § III. Smith alleges that the ADOC's refusal to allow his spiritual advisor in the execution chamber does just that.

In *Thai Meditation Association of Alabama, Inc.*, the Eleventh Circuit considered whether "the Alabama Constitution [is] markedly more protective of religious exercise than federal law in that it requires a plaintiff to show, as prerequisite to the application of strict scrutiny, only that government action 'burdened' – rather than 'substantially burdened' – his religious exercise[.]" 980 F.3d at 837. The court determined that the use of the term "burden" in place of the more familiar "substantial burden" language found within RLUIPA was intentional. 980 F.3d at 839-40. Consequently, the court held "what ARFA says is that *any* burden—even an incidental or insubstantial one—suffices to trigger strict scrutiny." *Id*. at 840.

As previously discussed, Smith believes his spiritual advisor's presence will provide spiritual comfort during his execution and ease his transition from life to death. The ADOC's policy forbids the spiritual advisor from entering the execution chamber. Thus, under the low threshold burden applicable under ARFA, the court finds the ADOC policy burdens Smith's religion by preventing him from engaging in an exercise important to his faith.

### 2.  The Traditional Strict-Scrutiny Standard

The ADOC may only burden Smith's freedom of religion, however, if it satisfies the traditional strict scrutiny standard. *See Thai Meditation Association of Alabama*, *Inc.*, 980 F.3d at 839 (citing Ala. Const. Art. I, § 3.01(V)(a)-(b)).  To satisfy strict scrutiny, government action must advance a compelling interest and "be narrowly tailored in pursuit of that interest." *See Espinoza v. Montana Department of Revenue,* 140 S. Ct. 2246, 2260 (2020).

As previously determined in this court's analysis of Smith's federal RLUIPA claim, the ADOC has a compelling interest in maintaining safety, security, and solemnity during an execution, particularly in light of evidence concerning security threats during executions, the vetting of execution team members, and the history of disciplinary problems with ADOC-employed chaplains and religious volunteers. The ADOC has also met its burden of showing that its policy is narrowly tailored in pursuit of furthering its compelling security interest. As a result, the court finds that Smith is unlikely to succeed on the merits of his ARFA claim.

### D.  Remaining Preliminary Injunction Factors

In addition to evaluating Smith's likelihood of success on the merits of his statutory and constitutional claims, the court must also determine whether irreparable injury will be suffered unless the injunction issues, whether the threatened injury to the movant outweighs whatever damage the proposed injunction

may cause the opposing party, and if issued, whether the injunction would not be adverse to the public interest. *See McDonald's Corp.,* 147 F.3d at 1306 (citing *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.,* 887 F.2d 1535, 1537 (11th Cir. 1989)).

Smith argues that he will suffer irreparable injury if an injunction is not granted; specifically, the loss of his First Amendment freedoms. (Doc. 3, p. 21.) Smith alleges that depriving him of the benefit of sharing his final moments with his chosen spiritual advisor will "result in the execution of a human being in an unconstitutional manner." (*Id.*)  Further, Smith argues that any harm to the ADOC "amounts to the minor inconvenience of the delayed execution of a prisoner who has been on death row for more than two decades . . . ." (*Id.*, p. 22.) Finally, Smith contends that the general public interest is served by granting relief in this case. He argues that neither the ADOC nor the public has an interest in conducting executions in a manner that violates the constitution. (*Id.*, pp. 22-23.)

For its part, the ADOC argues that Smith has failed to establish his burden on the remaining preliminary injunction factors. Particularly, the ADOC notes that Smith will not suffer irreparable harm in the absence of an injunction because Smith is not being prevented from practicing his faith. (Doc. 12, p. 39.)  The ADOC again points to its protocol that allows Smith to visit with his chosen advisor in the days, hours, and minutes leading up to his execution, during which time Smith can receive

comfort and spiritual guidance. (*Id.*) The ADOC also notes Smith's delay in requesting relief. (*Id.*, pp. 42-44.)

After considering the evidence submitted by both parties, the court finds that a preliminary injunction should not issue in this case. The court already has concluded that Smith is unlikely to succeed on the merits of his RLUIPA, First Amendment, and ARFA claims, and Smith has, in fact, been unsuccessful on the merits of his Establishment Clause claim as that claim has been dismissed. The court agrees with Smith that carrying out executions in an unconstitutional manner would result in irreparable injury and fails to serve the public interest. But that is not the case here.

As the court already has noted, Smith is not being deprived of the opportunity to practice his Christian faith. The ADOC's policy of requiring his spiritual advisor to view Smith's execution from an adjacent room, mere feet away and separated only by a glass barrier, does not substantially burden Smith's religious exercise. Because he is not being coerced to violate his religious beliefs, he will not suffer irreparable injury, and the public's interests will not be harmed. Instead, the court finds that the state of Alabama's strong interest in enforcing its criminal judgments and the public interest in seeing capital sentences completed both weigh heavily in favor of denying a preliminary injunction in this case. *See In re Blodgett,* 502 U.S. 236, 239 (1992) (per curiam).

What's more—as Smith has himself noted—Smith has been on death row for two decades and was on death row when the ADOC amended its execution protocol almost two years ago. In fact, Smith is represented by the same legal counsel who filed an identical lawsuit on behalf of another death-sentenced inmate on April 4, 2019.[26] Smith could have requested relief much earlier than weeks prior to his execution. He could have brought this action in April 2019 immediately after the change in protocol. Or contemporaneously with the claims in his initial § 1983 suit filed before another judge in this District. Although not fatal, "a delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm." *See Wreal,* 840 F.3d at 1248.

Because Smith is unlikely to succeed on the merits of any of his four claims, and because he has failed to carry the burden of persuasion on the remaining factors, the court finds that the "extraordinary and drastic remedy" of a preliminary injunction is not warranted here. *McDonald's Corp.,* 147 F.3d at 1306. Smith's motion is due to be DENIED.

## V.  CONCLUSION

Based upon the foregoing, it is ORDERED as follows:

1. The ADOC's Motion to Dismiss (Doc. 12) is GRANTED as to Smith's Establishment Clause claim;

---

[26] *See Burton v. Dunn*, Case No. 19-cv-242-RAH (M.D. Ala.)

2. The ADOC's Motion to Dismiss (Doc. 12) is DENIED as to Smith's RLUIPA, Free Exercise, and ARFA claims;

3. Smith's Emergency Motion for Preliminary Injunction (Doc. 3) is DENIED; and

4. All claims related to the Sunday services issue are DISMISSED as moot.

   **DONE** and **ORDERED** this the 2nd day of February, 2021.

<div style="margin-left: 40%;">

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

</div>